# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| SHELBY HOOD, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 3:24-cv-00690 |
| | ) | Judge Aleta A. Trauger |
| LIPSCOMB UNIVERSITY, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

## MEMORANDUM

Plaintiff Shelby Hood has brought a Title IX retaliation claim against Lipscomb University ("Lipscomb" or the "University"). Lipscomb has filed a Motion for Summary Judgment (Doc. No. 23), which, for the reasons set forth herein, will be granted.

## I. PROCEDURAL HISTORY

Hood alleges retaliation against the University under Title IX of the Education Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq.*, and seeks damages of $2,500,000 and attorney's fees. (Complaint, Doc. No. 1 ¶¶ 36–37; *id.* at 8–9.)[1] The University has counterclaimed for $2,866 in unpaid tuition, plus fees and interest.[2] (Answer, Doc. No. 12 at 8–9.)

---

[1] The plaintiff originally brought claims for hostile work environment and retaliation, each under both Title IX and the Tennessee Human Rights Act ("THRA"), Tenn. Code. Ann. § 4-21-101 *et seq.* (Compl. ¶¶ 34–41.) The court has since granted the plaintiff's Motion to Amend the Complaint to strike the THRA claims. (Doc. No. 22.) And Hood has expressly abandoned her Title IX hostile work environment claim. (Doc. No. 28 at 1–2 ("[Hood] has, therefore, chosen to proceed solely on the retaliation claim[.]").) Only the plaintiff's Title IX retaliation claim remains.

[2] The University filed and electronically served its Answer containing the counterclaim on July 22, 2024. (Doc. No. 12.) Hood has not filed a responsive pleading, despite being required to do so by Rule 12(a). The defendant has not moved for a default judgment and instead has given notice that, if the court grants its Motion for Summary Judgment, it will either "dismiss its

Lipscomb has filed a Motion for Summary Judgment (Doc. No. 23), accompanying Memorandum (Doc. No. 24), a Statement of Undisputed Material Facts ("DSUF") (Doc. No. 25), and exhibits (Doc. Nos. 26-1 through 26-14) with an Appendix (Doc. No. 26), to which the plaintiff has filed a Response (Doc. No. 28), exhibits (Doc. Nos. 28-1 through 28-7, Doc. No. 34-1[3]), and a Response to the Defendant's Statement of Undisputed Material Facts ("RDSUF") (Doc. No. 27). The defendant has filed a Reply. (Doc. No. 33.)

## II.  FACTS[4]

This case stems from Hood's allegation that Justin Briggs, then a professor at Lipscomb University, sexually harassed her. Hood was a graduate student in Lipscomb's Marriage and Family Therapy Program (the "Program") and, as part of the Program, saw clients at the affiliated Lipscomb Family Therapy Center (the "Center"). (RDSUF ¶ 1; Compl. ¶¶ 10–11; Answer ¶¶ 10–11.) The Program was run by Co-Directors Chris Gonzalez and Amber Kelley. (RDSUF ¶ 2.) Briggs was Clinical Director of the Center and a tenured professor in the Program, where he taught "Intimacy: Sexuality, Couple, & Sex Therapy." (*Id.* ¶¶ 4, 20, 32.) In his capacities both as a professor and as the Center's Clinical Director, he reported to Program Co-Directors Gonzalez and Kelley. (*See* Plan of Improvement Form, Doc. No. 26-6 at 100 (requiring Briggs to "[s]pecifically acknowledge that the . . . Clinical Director reports directly to the Program Co-Directors").) On June 6, 2023, Hood went to Professor Briggs' office after counseling a sexual trauma victim, and

---

counterclaim for unpaid tuition or move for stay pending interlocutory appeal." (Doc. No. 33 at 5 n.7.)

[3] The plaintiff filed the deposition of Natalie Hoyt (Doc. No. 28-4) but inadvertently omitted exhibits to the deposition, which the plaintiff has since filed, with leave (Doc. No. 35), as Doc. No. 34-1.

[4] The court views the evidence in the light most favorable to Hood, as the non-movant. *C.S. v. McCrumb*, 135 F.4th 1056, 1060 (6th Cir. 2025).

during their conversation the two discussed Hood's own experience with sexual trauma. (RDSUF ¶¶ 40, 44–49, 53–55.) Hood alleges that, during their conversation, Briggs "proceeded to ask inappropriate, intrusive questions regarding intimate details of the incident as well as talk about other sexually inappropriate topics with Plaintiff." (Compl. ¶ 18; *see also id.* ¶ 19.) Furthermore, Hood alleges, "Brigg's actions subjected Plaintiff to a sexually charged, hostile environment by a tenured professor who had direct influence over Plaintiff's educational opportunities and future professional endeavors." (*Id.* ¶ 18.) On September 7, 2023, Hood filed a complaint of sexual harassment against Briggs with Lipscomb's Title IX Coordinator, Kathy Hargis ("Coordinator Hargis") (Compl. ¶ 22; Answer ¶ 22; Doc. No. 24 at 3; Doc. No. 28 at 12.) Lipscomb's Title IX office investigated the claim, held a hearing on March 6, 2024, and on April 10, 2024 issued a Notice of Determination, finding that a preponderance of the evidence did not support that Briggs had engaged in sexual harassment. (Notice of Determination, Doc. No. 26-1 at 185, 189–192.)

Relevant to this case is a complex dynamic that was at play among the Program's faculty, leadership, and graduate students, on the one hand, and Briggs and his therapy practice, on the other, and the jobs pipeline that ran between them. Separate and apart from his teaching and clinical duties at the University, Briggs is the President of the Briggs Institute, Inc. (the "Institute"), a private therapy practice in Nashville. (Briggs Decl. ¶ 1, Doc. No. 26-5 at 1; *see also* Briggs Dep. 4:13–20, Doc. No. 28-6 at 2.) According to the plaintiff, Briggs had "exaggerated influence over both the [University's] academic program and its personnel," at least in part because many of the Program's staff have worked at the Institute. (Doc. No. 28 at 4.) Indeed, Program Co-Director Kelley reports that "[m]ost of the faculty at some point worked at the Briggs Institute." (Kelley Dep. 32: 7–8, Doc. No. 26-4 at 9.) At a minimum, the Institute has employed both of the Program's Co-Directors, Gonzalez and Kelley (Gonzalez Dep. 13:2–8, Doc. No. 26-2 at 4; Kelley Dep. 8:13–

20); the Center's Assistant Director of Clinical Operations, Natalie Hoyt (Hoyt Dep. 5:20–22, 7:16–22, Doc. No. 28-4 at 5, 7); and, according to Co-Director Gonzalez, Professors Hunter Stanfield, Dave Morgan, and Meghan Lacks (Gonzalez Dep. 13:2–14:11, 18:18–24). According to Co-Director Gonzalez, Briggs hired Program alumni exclusively. (*Id.* at 16:16–17:16.) In addition, according to Natalie Hoyt, who worked concurrently at Lipscomb and the Institute, Briggs also routinely hired Lipscomb alumni during their post-graduation, pre-licensure period, as they accumulated mandatory counseling hours for state licensure. (Hoyt Dep. 5:20–22, 18:9–16, 18:23–19:8, 20:19–22.)

The University acknowledges that it had responded to student complaints about Briggs involving "issues of personality conflict, interpersonal disrespect, [and] abrasiveness." (Doc. No. 24 at 9; *see also* RDSUF ¶¶ 19–28.) And Co-Directors Gonzalez and Kelley "counseled" Briggs in April 2023 to "immediately soften his approach to teaching . . . and to be more sensitive to student concerns." (RDSUF ¶ 35; *see also id.* ¶ 36 ("Gonzalez considered the verbal counseling as an 'admonishment.'").) The Co-Directors met with Briggs in June 2023 "to further admonish Briggs that students were complaining that he was talking with them about the anonymous Fall 2022 course evaluations," instructed him to "cease any such communications immediately," and informed him that he would no longer teach his "Intimacy" course. (*Id.* ¶¶ 37–39.)

In August 2023, the Co-Directors placed Briggs on a Performance Improvement Plan ("PIP") documenting interpersonal and pedagogical deficiencies and requiring him to take corrective actions. (Doc. No. 26-6 at 99–102.) The PIP and the Draft PIP from July 2023 (*id.* at 91–98) describe the Co-Directors' issues with Briggs at length, including insubordination toward Program leadership, insensitivity to students, and unwillingness to incorporate feedback. Moreover, the PIP itself and the Co-Directors' testimony together reveal their strained relationship

4

with Briggs, who needed to be constantly reminded that, at the University, Gonzalez and Kelley were his bosses, and not the other way around. For example, the PIP requires Briggs to "[a]cknowledge and honor the chain of command," including by "specifically acknowledg[ing]" that he "reports directly to the Program Co-Directors." (PIP, Doc. No. 26-6 at 99–100). Further, the PIP required him to "[b]ecome more sensitive in both content and process when engaging with students . . . and refrain from engaging in inappropriate conversations with students." (*Id.* at 100.) It required him to take ten hours of "sensitivity training on topics related to sexual assault, sexual trauma, rape, and consent . . . and [Briggs] will learn which topics are inappropriate to talk about with students." (*Id.*) Further, the PIP stated, "[g]iven that a percentage of students have experienced sexual trauma, sexual assault, and/or rape and given that there have been multiple complaints regarding pedagogical content and process regarding these topics," he was required to write a response essay on improving his discussions with students on these issues. (*Id.* at 101.) Briggs resigned shortly after he was issued the PIP. (Doc. No. 26-2 at 121 (August 31, 2023 email from Briggs to dozens of Program students and faculty informing them of his resignation, effective May 2024).)

Hood states that, after she reported Briggs' conduct to the University's Title IX Coordinator, "Dr. Briggs retaliated." (Doc. No. 28 at 5.) Hood describes a retaliatory campaign against her led by Briggs and his allies in the Program who worked for him at the Institute. For example, Hood alleges that, several weeks after she filed her complaint with the University, Hoyt sent Briggs an email with incendiary information about Hood meant to bolster Briggs' defense in the University's Title IX investigation. (Doc. No. 28 at 5 (first citing Oct. 2, 2023 Email, Doc. No. 34-1 at 1–2; and then citing Hoyt Dep. 35, 40).) Months later, on the same day that Lipscomb's Title IX office sent the parties to the Title IX complaint copies of its Investigative Report, January

5

12, 2024, Hoyt sent Professor Morgan, by email, a letter she wrote about Hood, for him to read at a faculty meeting. (Jan. 12, 2024 Email from Hoyt to Morgan, Doc. No. 34-1 at 4–5.) The letter registers a number of Hoyt's perceived issues with Hood and offers her "clinical opinion that she is not in a good state of mind to be seeing clients, and should be reevaluated for her standing in the program." (*Id.* at 5.) While it is undisputed that Professor Morgan read this letter aloud, the parties dispute the Co-Directors' reaction. (*Contrast* Doc. No. 28 at 6 ("Neither co-director reprimanded Dr. Morgan nor Hoyt for this blatant act of retaliation." (citing Kelley Dep. 66–68)), *with* Doc. No. 33 at 2 ("When Dr. Dave Morgan read Hoyt's letter raising concerns about Hood to [Program] faculty, Gonzalez shut down any further discussion of the letter." (citing Kelley Dep. 70–74)).)

At the Center, Hoyt's job involved both administrative responsibilities, like assigning clients to student clinicians, and supervising students. (Hoyt Dep. 7:20–8:2.) For reasons the parties dispute, during January 2024, for the most part Hood did not schedule counseling appointments with clients herself, but would instead email Hoyt to add appointments to the Center's calendar.[5] At 9:08 P.M. Sunday, January 14, 2024, Hood emailed Hoyt to ask that she schedule an appointment for one of Hood's patients. (Doc. No. 26-6 at 103.) Having not heard back,[6] at 12:14 PM Tuesday, January 16, 2025, Hood wrote again, in the same email thread, to

---

[5] In a January 19, 2024 email to Title IX Coordinator Hargis, Hood stated that, on January 8, 2024, Hoyt emailed Hood telling her that she was "no longer allowed to schedule [her] own client sessions" and that Hoyt would instead schedule them for her. (Doc. No. 26-4 at 94.) Hoyt has testified, to the contrary, that Hood was having technological issues, and so Hoyt began scheduling appointments for her, a decision in which the Co-Directors were involved. (Hoyt Dep. 86:11–87:7.) Hood states that the Co-Directors assigned Hoyt the task of scheduling Hood's appointments, "[d]espite the obvious conflict due to Hoyt's animosity." (Doc. No. 28 at 6.) Hood's own emails, however, support Hoyt's testimony: in emails following up with Hoyt, Hood reported that she had been able to schedule appointments herself. (Doc. No. 26-6 at 104–05.)

[6] The plaintiff describes Hoyt's nonresponse as a "refus[al] to schedule" her sessions. (Doc. No. 28 at 6.) The Center was closed Monday, January 15, 2024 through Wednesday, January 17,

seek confirmation that Hoyt had received her original email, this time including on the email (the "Email") her then-attorney, Lanie Bandell. (RDSUF ¶ 69; Doc. No. 26-6 at 103.) The text of the original January 14 email, included in the January 16 Email to Hoyt and Bandell, sought to schedule a session on a particular day and at a particular time, for a client identified only by a seven-digit Client ID number, not by name. (RDSUF ¶ 69; Doc. No. 26-6 at 103.)[7]

The University imposes client confidentiality rules on its student clinicians, both to protect its clients' privacy and to train its students in confidentiality practices. (RDSUF ¶ 75.) Accordingly, the Lipscomb University Marriage and Family Therapy Program & Lipscomb Family Therapy Center Policies & Procedures Manual (the "Manual") (Doc. No. 26-5 at 6–119) sets forth various policies regarding confidentiality. (*See, e.g.*, Manual at 55–63, 84–88.)[8] In pertinent part, the Manual provides: "To protect client confidentiality, at *no time* is any identifiable client information, including but not limited to, client names, contact information, geographic identifiers (e.g., zip codes), *dates of service, and ID numbers* to be saved anywhere other than on the cloud storage associated with the Lipscomb University's Google Apps account and the hard drives of approved LFTC computers." (RDSUF ¶ 6 (quoting Manual at 55) (emphasis added).)

---

first in observance of Martin Luther King, Jr. Day and then because of inclement weather. (Kelley Decl. Ex. 1, Student Incident Timeline, Doc. No. 26-13 at 7.) Moreover, as part of the University's Title IX investigation, Coordinator Hargis testifies that she "had a detailed analysis done by Lipscomb's IT department of Natalie Hoyt's email practices in relation to Miss Hood's communications which found her emails were not singled out or ignored as compared to other students." (Hargis Decl. ¶ 17, Doc. No. 26-7 at 6.)

[7] The University has filed this unredacted email on the public docket, available to any interested person, even though it disciplined Hood for sending the same email to her attorney. This is especially noteworthy because the parties filed a joint motion, which the court granted (Doc. No. 30), to seal another part of the record containing "highly confidential personal and medical treatment [information.]" (Doc. No. 29 at 1.)

[8] The court refers to the Manual's pagination, rather than that assigned by the court's electronic filing system.

According to the Manual, such "personally identifiable information" can be stored only in on-site paper files, on University-owned electronic devices, and on "Lipscomb's secured Google Apps cloud storage." (Manual at 63.) Before a clinician can share "a client's confidential information" with anyone outside of the Center, the clinician must complete an "Account of Shared Information" and receive a signed "Release of Information Form" from the client. (*Id.* at 76–77; *see also id.* at 86 ("Anytime you wish to communicate with anyone other than the client, you must obtain a Release of Information Form. Clients have the right to know and approve the release of any information related to their treatment, including the fact that they are in therapy.").) And "even with a signed Release of Information, only the *minimum* necessary information is to be released to individuals or organizations outside of the [Center]." (*Id.* at 77 (emphasis in original).) Further, the Manual provides:

> Severe consequences may occur in the event that anyone (e.g, administrators, supervisors, clinicians, etc.) fails to adhere to policies, procedures, and state and federal law designed to protect clients' personally identifiable information. Depending on the nature of the offense, consequences could include, but are not limited to, suspension, termination, or legal action.

(Manual at 63; see also RDSUF ¶ 7.)

After Hood emailed Hoyt, as Hood puts it, "[p]redictably, Hoyt refused to schedule" her client session, as retaliation for filing the harassment claim against Briggs. (Doc. No. 28 at 6, 11–12.) Emails between Hoyt and the Co-Directors show that, when Hoyt received Hood's second Email—the one that included Hood's attorney—Hoyt asked Co-Directors Gonzalez and Kelley for advice. (Doc. No. 34-1 at 6–7.) In her email to Gonzalez and Kelley, Hoyt notes that Hood's Email "includes a third party," and that therefore Hood "has shared confidential client information including ID number and date[] of service, with this third party." (*Id.* at 7.) Given what Hoyt identified as a breach in confidentiality, along with Hoyt's belief that Hood was not "competent and should not be seeing clients," she informed the Co-Directors that she could not ethically

8

schedule the appointment. (*Id.*) Kelley responded to say that she and Gonzalez would look into the situation and that, in the meantime, Hoyt should not respond. (*Id.* at 7–9.)

Gonzalez reviewed Hood's email and determined that Hood had included Bandell on an email with a client's ID number and date of service. (RDSUF ¶ 57.) Thereafter, on January 18, 2024, the Co-Directors notified Hood by email about the breach of policy and asked to meet on January 22, 2024. (Doc. No. 26-4 at 89.) On January 22, Co-Directors Gonzalez and Kelley placed Hood on a Clinical Practice Improvement Plan ("CIP") (Doc. No. 26-1 at 152–53). (RDSUF ¶ 61.)[9] The CIP required Hood to suspend her clinical work—but not her academic classes—for the spring semester, to allow for "slow, highly supervised re-entry to clinical practice . . . in Summer 2024;" to complete ten hours of specified continuing education courses on ethics, data privacy, and confidentiality, at the Program's expense; and to write a pass/fail 1,000-word essay about what she learned. (CIP, Doc. No. 26-1 at 152–53.) Hood withdrew from the Program the next day. (RDSUF ¶ 65.)

## III.   LEGAL STANDARDS – RULE 56(a)

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including "depositions, documents, electronically stored information, affidavits or declarations, stipulations  .  .  . , admissions, interrogatory answers, or other

---

[9] As in the case of paragraph 61 of the University's Statement of Undisputed Material Facts, the plaintiff has indicated that several of the defendant's proposed facts are "disputed," while the plaintiff's response and the record make clear that only a possible implication or subtext is disputed. In these situations, the court treats the fact as undisputed. In the case of paragraph 61, for example, the defendant states that, after making various consultations, the Program Co-Directors placed Hood on a CIP. The plaintiff disputes this fact on the grounds that the decision was made in retaliation for her protected activity—the implication being, the court surmises, that the Co-Directors' consultations with others did not affect their decision. However, the plaintiff does not dispute that, on January 22, 2024, the Co-Directors placed her on a CIP—indeed, it forms the entire basis for this lawsuit.

9

materials"—that it believes demonstrate the absence of a genuine dispute over material facts. Fed. R. Civ. P. 56(c)(1)(A). Then the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Credibility judgments and the weighing of evidence are improper. *Huang v. Ohio State Univ.*, 116 F.4th 541, 555 (6th Cir. 2024) (citing *Anderson*, 477 U.S. at 255).

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But a defendant is not entitled to judgment "if there is evidence in the record 'on which the jury could reasonably find for the plaintiff.'" *Huang*, 116 F.4th at 555 (citing *Anderson*, 477 U.S. at 252). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). "[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Anderson*, 477 U.S. at 248.

## IV.    DISCUSSION

### A.    Title IX framework

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). If a funding recipient[10] retaliates against someone who complained of sex discrimination, that is itself sex discrimination under Title IX. *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)). Courts review Title IX retaliation claims under Title VII's analogous test. *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251 (6th Cir. 2023). Because Hood relies on indirect evidence, the court applies the burden-shifting framework set forth in *McDonnel Douglass Corporation v. Green*, 411 U.S. 792 (1973). *Id.* Under that framework, the plaintiff must first make out a *prima facie* case of retaliation. *Doe v. Univ. of Ky.*, 111 F.4th 705, 716 (6th Cir. 2024). To do so, the plaintiff must show that: "(1) she engaged in 'protected activity,' (2) the University 'knew of the protected activity,' (3) she suffered an 'adverse school-related action,' and (4) a 'causal connection exists' between the cited protected activity and the alleged adverse action." *Id.* (quoting *Bose*, 947 F.3d at 988). If the plaintiff meets this "eas[y]" burden, then "it becomes the University's burden to articulate a 'legitimate, nondiscriminatory reason for its action.'" *Id.* (first quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); and then quoting *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017)). If the University succeeds, the burden shifts back to the plaintiff to show that the proffered

---

[10] Lipscomb concedes that it receives federal funding for the purposes of Title IX. (Doc. No. 24 at 1 n.2.)

reason is "really a pretext for unlawful retaliation." *Goldblum*, 62 F.4th at 251 (citing *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1132–33 (6th Cir. 2020)).

## B. *Prima facie* case

It is undisputed that Hood engaged in a protected activity that the University knew about by filing a Title IX complaint. (Doc. No. 24 at 17.) The defendant argues that no reasonable jury would find that Hood could make out a *prima facie* case because there is insufficient record evidence to support either that she suffered an adverse action or that her protected activity was the reason for the adverse action.

### 1. *Adverse action*

A purported retaliatory action is "adverse" if "the action would dissuade a reasonable person from engaging in the protected activity." *Univ. of Ky.*, 111 F.4th at 716 (citing *Gordon*, 686 F. App'x at 320).[11] This standard "is not onerous." *Id.* (quoting *Henry v. Abbott Lab'ys*, 651 F. App'x 494, 504 (6th Cir. 2016)). The University argues that putting Hood on the CIP was not an adverse action because it "allowed Hood to remain on track to graduate, albeit a semester later than she may have planned," in addition to requiring her to take continuing education courses. (Doc. No. 24 at 17–18; *see also id.* at 18 ("The only adverse action Hood suffered was her self-imposed withdrawal from Lipscomb prior to graduation.").) Further, the University contends that Hood "offers [only] speculative allegations as to the hardship the CIP may have caused," and in any case withdrew before attempting to comply with it. (Doc. No. 33 at 4.) Hood responds that the CIP removed her from clinical work for a semester and, she contends, rested the discretionary decision to determine whether she met the CIP's requirements with Co-Directors aligned against

---

[11] This standard is the same as Title VII's, except that an adverse action under Title IX "must be 'school related.'" *Univ. of Ky.*, 111 F.4th at 716. The University does not contend that the allegedly adverse action is not school-related.

her, putting the possibility of graduating, at all, in doubt—all adverse actions. (Doc. No. 28 at 14–15.)

To begin, whether an action would dissuade a reasonable person from engaging in protected activity is typically a question of fact for the jury. *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 809 (S.D. Ohio 2014) (citing *Wurzelbacher v. Jones–Kelley,* 675 F.3d 580, 583–84 (6th Cir. 2012)). The University has not cited record evidence supporting its contention that no reasonable jury could find that Hood suffered an adverse action under these circumstances. As the Supreme Court has stated in the Title VII context, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006). The court easily finds that a reasonable jury could find that putting a student on a CIP like the one at issue would dissuade a person of ordinary firmness from filing or pursuing a Title IX claim against a professor. *Accord, e.g.*, *Yap v. Nw. Univ.*, 119 F. Supp. 3d 841, 851–52 (N.D. Ill. 2015) ("Failing to graduate on time, exclusion from educational events, and reputational harm within the department, taken together, are sufficiently adverse to deter a reasonable student from filing a sexual harassment claim."); *Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 146–47 (D.D.C. 2019) (denying the university-defendant's motion to dismiss where a plaintiff pled that it had "delayed clearing her to graduate" and applying *Burlington*'s "broad interpretation of the adverse action element of a retaliation claim . . . to Title IX").

2.    *Causal connection*

Next, the court must determine whether Hood has met her "minimal" burden to present "evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Univ. of Ky.*, 111 F.4th at 722 (first quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997); and then quoting *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013)).

13

Hood contends that, after she filed the Title IX complaint with the University on September 7, 2023, "Dr. Briggs mobilized his faculty allies" against her. (Doc. No. 28 at 16 (describing various actions, some described by the court, above, by Briggs, Hoyt, and Morgan); *see also id.* at 11 (describing further efforts by faculty members to pressure the Co-Directors).) Hood further contends that Program Co-Directors Gonzalez and Kelley "did nothing to stop this coordinated effort" and "failed to shield Plaintiff from continued interaction with Hoyt." (*Id.* at 17.) The plaintiff describes the Co-Directors' decision to impose the CIP as "aligned precisely with what Dr. Briggs, Dr. Morgan, and Ms. Hoyt had . . . advocated," concluding, without citation, that the "evidence strongly supports the conclusion that the co-directors implemented the CIP to appease faculty who were seeking retaliation and were upset about the Title IX complaint filed against Dr. Briggs." (*Id.*) As the plaintiff puts it, "a minor technical issue was weaponized by individuals hell-bent on retaliating against Plaintiff." (*Id.* at 7.)

The defendant argues that too much time passed between Hood's filing the Title IX complaint and the adverse action to constitute sufficient evidence of retaliation. (Doc. No. 24 at 18; Doc. 33 at 4–5.) Further, the University argues that the Co-Directors implemented the CIP free from faculty influence, such that the record contains no evidence of retaliation. (Doc. No. 33 at 1.) And in any case, the University argues, Hood's confidentiality lapse was an intervening reason for implementing the CIP, which negates any inference of causation. (Doc. No. 33 at 4–5.)

Hood acknowledges the defendant's argument that "the faculty pressure campaign had no impact on their decision to implement the CIP" but responds only to say that the outcome "accomplished exactly what Briggs and his colleagues had been urging." (Doc. No. 28 at 12.) The plaintiff puts forth no evidence that the faculty pressure campaign influenced the Co-Directors or that they had ill will towards her. In fact, as the University argues, the record contains evidence to

14

the contrary. While the plaintiff rightly points out the complicated power dynamics at play, by the time the Co-Directors implemented the CIP, in January 2024, their relationship with Briggs was strained, if not "effectively severed," as the University states. (Doc. No. 33 at 1.) By that time, neither was still employed by the Institute—both resigned months before Hood filed her Title IX complaint with the University. (Gonzalez Dep. 21:2–7 (Gonzalez stopped working for Briggs in June 2023); Kelley Dep. 8:13–20 (Kelley stopped working for Briggs in July 2023).) In fact, Gonzalez testified that he quit the Briggs Institute, in "small part," *because of* Hood's experience with Briggs. (Gonzalez Dep. 21:11–20.) And, as the plaintiff acknowledges, "[f]ollowing" her unofficial complaint to the Co-Directors about Briggs, they put him on a Performance Improvement Plan ("PIP"). (Doc. No. 28 at 4.) Moreover, as the plaintiff states, the "PIP explicitly addresses Dr. Briggs'[] treatment of students, including Plaintiff." (Doc. No. 28 at 4.) Hood has simply adduced insufficient evidence that the Co-Directors, who implemented her CIP, were influenced by the alleged faculty campaign against her or that they had any reason to retaliate against her. The court therefore turns to temporal proximity.

"[A] four-month time gap [is], by itself, insufficient to satisfy causation." *Kovacs v. Univ. of Toledo*, No. 25-3035, 2025 WL 2630563, at *3 (6th Cir. Sept. 12, 2025) (first citing *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020); and then citing *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 550 (6th Cir. 2008)). And "[t]emporal proximity alone generally is not sufficient to establish causation." *Kenney*, 965 F.3d at 448 (citations omitted) (noting that "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods" (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)) (other citations omitted)). Thus, in the absence of other evidence, temporal proximity alone can show causation at the *prima facie* stage only if the adverse action "occurs very close in

15

time" after the defendant learns of the protected activity.[12] *Mickey*, 516 F.3d at 525; *see also*

*Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 310 (6th Cir. 2023) ("[I]f the act occurs within 'days

or weeks' . . . , the close proximity can sometimes (if rarely) permit an inference that the one

motivated the other." (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir.

2020))); *see also Campbell-Jackson v. State Farm Ins.*, No. 23-1834, 2024 WL 4903807, at *7

(6th Cir. Nov. 27, 2024) (finding that two weeks was sufficient to "establish causality on this basis

alone").

Hood filed her Title IX complaint on September 7, 2023 and was placed on the CIP on

January 22, 2024—more than four months later.[13] Given the time between the protected activity

and the adverse action, the plaintiff cannot rely on temporal proximity alone to show causation at

the *prima facie* stage. *Accord Lemaster*, 65 F.4th at 310 (finding, in a First Amendment retaliation

case brought under 42 U.S.C. § 1983, that "about four and a half months" between the protected

activity and the adverse action "does not permit [the plaintiff] to rely on temporal proximity

alone"). The plaintiff has not presented "evidence sufficient to raise the inference that her protected

---

[12] "[W]hen assessing temporal proximity, we consider whether the biased actor took the first opportunity that he had to retaliate." *Gray v. State Farm Mut. Auto. Ins. Co.*, 145 F.4th 630, 639 (6th Cir. 2025) (citing *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 665 (6th Cir. 2020)). The plaintiff does not argue that the University's putting her on the CIP in January 2024 was its first opportunity to retaliate against her, and the court does not infer it from the record construed in the plaintiff's favor.

[13] The plaintiff states that the relevant dates are the date the Title IX Coordinator sent the parties to the complaint her office's Investigative Report—January 12, 2024—and the date Hood was placed on the CIP, January 22. (Doc. No. 28 at 17–18 ("This ten-day period was directly on top of the investigative period (protected activity timeframe) [sic] firmly supports a presumption of causation.").) But the plaintiff offers no explanation for why the date the Title IX office issued its preliminary report would be the date by which the court measures temporal proximity.

16

activity was the likely reason for the adverse action," *Univ. of Ky.*, 111 F4th at 722, and therefore has not made out a *prima facie* case of retaliation.[14]

However, out of an abundance of caution, the court assumes that the plaintiff has made out a *prima facie* showing and turns to the next steps in the burden-shifting framework.

### C.    Legitimate reason for adverse action

If the plaintiff establishes a *prima facie* case, the defendant "must articulate a legitimate, nonretaliatory reason" for the adverse action. *Goldblum*, 62 F.4th at 251. The University's stated reason for putting Hood on a CIP was her disclosure of confidential client information to a third party. (Doc. No. 24 at 18; Doc. No. 33 at 2–3, 5.) As discussed above, Hood included her attorney on an email with confidential information, as defined by University policy. The University has met its burden of production, and the plaintiff does not argue to the contrary.

---

[14] The plaintiff is equivocal about what the alleged retaliation consisted of. In addition to the Co-Directors' decision to put Hood on the CIP, the Complaint also alleges that, after Hood filed the Title IX complaint with the University, "Defendant, *through Briggs*, began to retaliate against" her, including by referring to her as a "mentally unstable and a risk to her clients" during the Title IX investigation. (Compl. ¶ 23 (emphasis added).) And, Hood alleges, "Briggs solicited negative comments and false statements from other faculty members in an effort to remove Plaintiff from the program." (*Id.* ¶ 27.) Hood refers to the letter that Hoyt wrote, and Professor Morgan read, as a "blatant act of retaliation." (Doc. No. 28 at 6.) The plaintiff describes Hoyt's refusal to schedule her client's appointment as "retaliation." (Doc. No. 28 at 17.) Moreover, the Complaint alleges that the "retaliation *culminated* when Defendant alleged that Plaintiff had violated client confidentiality," and the University relied on that allegation as a pretext to implement the CIP. (Compl. ¶ 28 (emphasis added).)

Importantly, "Title IX does not provide for individual liability," but instead, an institution can be liable "only for its own misconduct." *Bose v. Bea*, 947 F.3d 983 (6th Cir. 2020) (quoting *David v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)) (internal quotation marks omitted). As the Sixth Circuit recently recognized, Title IX, unlike Title VII, does not authorize *respondeat superior* liability. *Childers v. Casey Cnty. Sch. Dist. Bd. of Educ.*, No. 23-5713, 2024 WL 3623527, at *3 n.2 (6th Cir. Aug. 1, 2024) (citing *Bose*, 947 F.3d at 989–90). "Instead, Title IX imposes liability only for a funding recipient's own official decisions and not for its employees' independent actions." *Id.* (citation modified). The plaintiff's contention that numerous faculty—other than the Center's Co-Directors acting on behalf of the University by issuing the CIP—retaliated against her is not actionable under Title IX.

17

**D.     Pretext**

Assuming that the plaintiff has established a *prima facie* case of retaliation, and the defendant having produced a legitimate, nonretaliatory reason for the adverse action, it then becomes the plaintiff's burden to demonstrate that the proffered reason for the adverse action was "really a pretext for unlawful retaliation." *Goldblum*, 62 F.4th at 251. There is no prescribed way to show pretext. *Id.* at 252. However, "[p]laintiffs typically show pretext by establishing one of three things: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'" *Id.* (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Hood proceeds on each of these theories (Doc. No. 28 at 18.) The court finds that Hood has not produced evidence from which a jury could reasonably reject the University's stated reason and find that the true reason was unlawful under Title IX.

*1.     No basis in fact*

First, Hood argues that including her attorney on the Email did not violate University policy because it is "factually untrue" that she sent a third party "personally identifiable information." (Doc. No. 28 at 18.) The plaintiff's argument is not wholly unreasonable. The email she sent her attorney included only a client's Center-assigned numerical ID and the time of a proposed appointment. That information, absent access to a corresponding, internal database, did not, in layman's speak, identify a client. (*Id.*; *see also id.* at 7 (noting that the client ID number "cannot be used to identify the client by anyone who does not have access to the [Center's] Client Data spreadsheet" (quoting Manual at 71)).)

But the court cannot rely on commonsense notions about what constitutes identifiable information. And the court is not persuaded by the plaintiff's statement that the Manual "must be read to mean that the ID number & date of service must be tied to the key or another piece of client

18

information that identifies the client." (RDSUF ¶ 59.) In a section regarding client confidentiality, the Manual defines "identifiable client information" as "including but not limited to, client names, contact information, geographic identifiers (e.g., zip codes), dates of service, and ID numbers." (RDSUF ¶ 6.) It is undisputed that the Manual allows "severe consequences," including but not limited to "suspension, termination, or legal action," for the "unauthorized release of such information by Lipscomb . . . clinicians." (*Id.* ¶ 7.)[15] Hood has not raised a genuine issue of material fact regarding this method of showing pretext.

### 2.   *Not for the stated reasons*

Hood argues that the University's stated reasons for placing her on a CIP—that she emailed her attorney confidential information[16]—did not actually motivate the Co-Directors' decision to that effect. (Doc. No. 28 at 13.)

First, the plaintiff argues that the stated reason is pretextual because the University never found her counseling deficient. The plaintiff states that she had received "no complaints from clients and no complaints from professors" and notes that Co-Director Gonzalez himself "admitted that Plaintiff's clinical skills were not a concern," which "contradicts" the need for the CIP. (Doc. No. 28 at 18–19.) But, as the University rightly points out, Hood was disciplined for breaching confidentiality, not for a lack of clinical skills. (Doc. No. 33 at 5.) Hood may have sterling counseling abilities, but that is not evidence against the University's stated reason for disciplining her.

_____

[15] The plaintiff purports to dispute paragraph 7, but only to point out that the Manual's statement regarding punishment also includes language indicating that the consequences for infringement of confidentiality rules depends on the circumstances. (RDSUF ¶ 7.)

[16] (*See* CIP, Doc. No. 26-1 at 152 ("Reason for Improvement Plan[:] Emailing confidential client information to an individual outside of the [Center]; [v]iolation of the . . . Program standards as outlined in the . . . Manual[.]").)

19

Second, Hood argues that the Co-Directors imposed the CIP "to help defend the Title IX complaint," as orchestrated by a faculty "campaign to ruin Plaintiff's academic career and damage her ability to pursue her profession," which was "effectively handed to the co-directors after Dr. Briggs, Dr. Morgan, and Hoyt coordinated a plan." (Doc. No. 28 at 18.) After Hood sent her attorney confidential information, she says, the "co-directors seized on this harmless inclusion [of information] . . . and used it as the basis to implement the . . . [CIP], as had been urged by faculty allies of Dr. Briggs." (*Id.*) Furthermore, the "co-directors knew this was a retaliatory action." (*Id.*) This argument suffers from the same infirmities as the plaintiff's causation argument, discussed above: Hood does not cite record evidence to support the contention that Co-Directors Gonzalez and Kelley were motivated to place Hood on the CIP because she filed the sexual harassment complaint against Professor Briggs.

### 3. Insufficient reasons

Last, the plaintiff argues that, even if she did violate the University's confidentiality rules, her conduct did not warrant being placed on the CIP. (Doc. No. 28 at 14.) Hood states that the Co-Directors were not required, under the Manual, to discipline her, and that she was punished more harshly than another student with a similar infraction. (Doc. No. 28 at 7.) In this case, as the court has discussed, it is undisputed that the Manual provides for "severe consequences," including suspension, termination, or legal action for the unauthorized release of identifiable client information, as defined by the Manual. (RDSUF ¶¶ 6–7.) And while "the failure to *uniformly* apply a progressive discipline policy can be evidence of pretext," for a comparator's more lenient punishment to be evidence of pretext, the plaintiff must show that she is similar to the comparator "in all relevant respects." *Goldblum*, 62 F.4th at 255 (emphasis in original) (citation modified). In *Goldblum*, which concerned a Title IX retaliation claim brought by an employee, the court wrote: "[t]o constitute similarly situated employees, the individuals with whom [the plaintiff] seeks to

compare her treatment 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 364 (6th Cir. 2010)).

Hood identifies "a similar student incident" in which a Program student left an iPad with client information on it unattended in a hallway, but the student was not punished. (Doc. No. 28 at 8 (citing Kelley Dep. 127–130).) The plaintiff states that the facts of this case are similar because "the laptop [sic] and the ID code [in the Email] were each locked with no ability to access the underlying information." (*Id.*) The cases are not similar in all relevant respects. In the incident the plaintiff describes, the student did not share any client information; rather, if someone had taken the iPad and managed to somehow unlock it, then they could have had access to client information. In this case, Hood shared client information. Moreover, while the plaintiff describes the incident as a "student leaving a laptop [sic] unattended in a hallway," as Co-Director Kelley explains, "the iPad was left in the upstairs of the [Center], which is not a very public area." (Kelley Dep. 127:13–16).) And, while Hood violated a University policy, Kelley testified that the other student did not. (*Id.* at 129:19–23 ("I do not believe that having an iPad in the [Center] is a violation of our policy."); *but see id.* at 131:9–15, Doc. No. 26-4 at 34 ("[I]t is best practice for someone to take their iPad with them.").) Hood has not cited sufficient record evidence to show that the Co-Directors had insufficient reason to implement the CIP.

The plaintiff makes two further claims in support of her pretextual argument, which the court will briefly address. First, the plaintiff states, without providing citation to the record, that the University "has been reluctant, if not deliberately evasive, in acknowledging that the entire adverse action rested solely on the inclusion of a non-identifying code in an email sent to Plaintiff's

21

Title IX attorney." (Doc. No. 28 at 19.) The plaintiff cites Sixth Circuit caselaw for the proposition that "[s]uch inconsistency and evasiveness seem to be the epitome of pretext meant to mask retaliatory discrimination[.]" (*Id.* quoting *Mickey*, 516 F.3d at 527). Not only does the plaintiff fail to cite record evidence to support this claim, but the plaintiff cites evidence in contradiction. For example, the plaintiff quotes a January 18, 2024 email from the Co-Directors notifying Hood that they had reviewed the email Hood sent to her attorney with the at-issue client information, and that, "[b]ecause of this violation, a plan of action must be put in place." (*Id.* at 7 (quoting Doc. No. 26-4 at 89).) And the plaintiff cites the explanation the CIP itself provides: "Emailing confidential client information to an individual outside of the [Center.]" (*Id.* at 9–10 (quoting CIP, Doc. No. 26-4 at 124).)

Second, apart from the Title IX complaint Hood filed against Briggs for sexual harassment, Hood also "reported [to Coordinator Hargis] that Hoyt's failure to schedule her client and the co-directors' decision to suspend her clinical privileges was retaliatory." (Doc. No. 28 at 12 (citations omitted); *see also* RDSUF ¶ 3 (describing Hood's report to Hargis, in response to the defendant's proposed undisputed fact that Lipscomb prohibits harassment and discrimination).) Hood argues that Hargis' "failure to investigate the CIP as a retaliatory action further supports a finding of discriminatory motive." (Doc. No. 28 at 19.) Even if the court accepted the plaintiff's characterization as true, which the University contests (Doc. No. 33 at 4), the plaintiff does not explain how Coordinator Hargis' failure to investigate a report of retaliation is evidence that the Co-Directors' decision to place Hood on the CIP was retaliatory. Hood has not shown that the University's decision to place her on the CIP was pretextual and that the real reason was retaliatory.

## V.     CONCLUSION

For the foregoing reasons, the court finds that there is no genuine question of material fact remaining, and Lipscomb is entitled to judgment as a matter of law. Accordingly, the court will

22

grant Lipscomb's Motion for Summary Judgment (Doc. No. 23), and the Complaint will be dismissed with prejudice. Lipscomb's counterclaim remains.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge